TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
NV Bar #3984
1130 Wakefield Trail
Reno, NV 89523
Tele (775) 337-0323
keysercooper@lawyer.com
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KIM JACKSON, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **Jury Demand** |
| CHRIS DUTRA, JASON EDMONSON, ERIC DEJUSUS, | |
| Defendants. | |

## **PRELIMINARY STATEMENT**

The Fourth Amendment protects not only a person's broad interests in privacy, but also, and specifically, a person's interest in being shielded from physical governmental intrusions.[1] An entry into a residence that is not under a warrant, that lacks consent, and that is not justified by exigent circumstances or an emergency, is unreasonable.[2] *Id*. This is basic black letter law and well known to police officers. If police officers have no lawful purpose at the residence of a law-abiding citizen they are not to remain outside, milling about, congregating like a gang of thugs, talking about kicking in the door and getting a ram to break it down.

Here, the police came to the door of Plaintiff Kim Jackson ("Jackson") on a civil matter. The officers did not have a warrant. Jackson was not wanted for a crime, not engaged in criminal activity, and not the subject of a criminal investigation. Ms. Jackson exercised her Fourth Amendment right to deny the officers entry. However, when the civil matter was dispensed with,

---

[1] *Mendez v. Cnty of L.A.,* 897 F.3d 1067, 1075 (9th Cir. 2018).

[2] *Id.*

1

the officers refused to leave. They hung around the residence, like petty criminals, muttering and talking,[3] stewing about being denied entry, discussing getting a ram to break down her door, angry that Jackson had exercised her Fourth Amendment rights to deny them entry. Jackson was traumatized by the police conduct, so upset that they would break down her door, that she called 911 while the officers were outside, trying to discover what she could do to get them to leave.

The 911 operator advised that she go outside and talk to the officers, which Jackson did. Once outside, the officers insisted she could not re-enter her home—Jackson had no idea why she was commanded to remain outside. The officers were not questioning her, not investigating a crime, and not interviewing witnesses. The officers were not involved in any legal duty. When Jackson attempted to re-enter her home, the officers pounced—yelling that she had violated "orders" not to re-enter her home. Jackson was grabbed, manhandled, flipped upside down, pulled in two directions, and physically injured. Even when Jackson yelled out in pain and screamed: "I'm an epileptic!" the officers did not stop. Jackson was handcuffed, arrested for "obstructing," and lectured by the officers that she got what she deserved. The officers said: "You thought you were playing games with us! "We're in charge here not you." And, "You caused this because you didn't act like a human being."

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201; 42 U.S.C. §§ 1983 and 1988; and pendent state claims.

2. Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. § 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district.

## PARTIES

3. Plaintiff KIM JACKSON ("Jackson") is a citizen of the United States residing in Washoe County, Nevada.

---

[3] All of the officers petty remarks and insulting comments about Jackson were caught on the audio portion of their body cameras. All comments made in quotations are direct comments taken from the audio portion of the officers' body cameras.

2

4. Defendant CHRIS DUTRA ("Dutra") is and at all relevant times was an SPD officer acting under color of law and is sued in his individual capacity.

5. Defendant JASON EDMONSON ("Edmonson") is and at all relevant times was an SPD officer acting under color of law and is sued in his individual capacity.

6. Defendant ERIC DEJESUS ("Dejusus") is and at all relevant times was an SPD officer acting under color of law and is sued in his individual capacity.

7. The Defendant SPD officers are referred to jointly as "the officers." Plaintiff alleges that these SPD Defendants and/or their agents, co-employees, and servants performed, participated in, were an integral part of, and aided and/or abetted in some manner, the acts averred herein and proximately caused the damages alleged. Plaintiff further alleges that these SPD officers acted together, jointly, collectively, in concert, thereby ratifying, approving, and authorizing all actions of each to other.

## **FACTUAL ALLEGATIONS**

8. Jackson is a small, frail, disabled African-American woman who suffers from epilepsy. She stands just under 5' 01 and weighs 100 pounds. She is a Sunday School teacher.

9. Jackson receives government disability because of her epilepsy.

10. Jackson has no criminal history.

11. Jackson lives with her son. At the time of the incident her son was nine years old.

12. On or about summer of 2018, Jackson became aware her three year old cousin, A.M. had been placed with Child Protective Services ("CPS"). Jackson called CPS to inform them she was A.M.'s cousin and would like to have custody of the child. CPS informed Jackson of the requirements. Jackson passed the background check and began fulfilling the prerequisites to become a foster parent for her young cousin. On or about late August, 2018, CPS placed A.M. in JACKSON's care on a 24 hour,

3

seven day a week status as a foster child. Jackson bought A.M. a bed, clothing, toys and took her for her vaccinations. Jackson received payment from Washoe County for her services as a foster parent.

13. On or about October 29, 2018, Jackson had a meeting with CPS. Jackson was informed there would be a change in A.M.'s placement. Jackson became alarmed as she was attached to her little cousin. There was no accusation of abuse, neglect, or any parenting problem—Jackson was simply informed there would be a change, with a meeting set in a day or two to confirm placement. Jackson agreed to attend and sent the social worker a text stating she would be at the meeting with the child.

14. On November 1, 2018, at or about 9:00-9:30 p.m., Jackson was in her apartment helping her son with his homework. A.M. was asleep. It was a quiet night, the large apartment complex where she resided was tranquil. Jackson was unaware the Defendant officers were congregating outside Jackson's unit with social workers for the express purpose of retrieving A.M.—a purely civil matter. The officers did not have a warrant for Jackson's arrest or a warrant to search her apartment—they had no information that Jackson had committed a crime, was about to commit a crime, or had a criminal record. Similarly, the social workers made no accusations that Jackson had mistreated A.M., or abused or neglected the child in any way.

15. The officers walked to Jackson's apartment. Dutra, standing outside Jackson's door, identified himself. Dutra explained through the closed door that they were present to: "See if everything is okay." This was untrue as there were no reports that Jackson, or anyone inside her dwelling, were not "okay." Dutra said, "Can you open the door so I know you're alright. Some folks wanted us to make sure everything is okay."

16. Jackson, like many African-Americans is afraid of the police. Jackson asked through the door if Dutra had a "warrant." Dutra said he did not have a warrant. Jackson refused to open the door—correctly believing if the officers had no warrant she was not required to do so. Through the

closed door Jackson explained to the officers that the police frighten her and she preferred not to open the door since they had no warrant.

17.     The social worker said: "I need to see the kid. I need you to open the door. I need to have a conversation with you. I don't want to do this in front of the kiddo." Jackson said: "She is sleeping, do you want me to wake her up?" An officer says: "Yes, we do." Jackson woke the child and carried her out on to the apartment balcony. While Jackson was on the balcony, the social worker insisted the child be handed over to her. An officer is heard saying: "This is kidnapping if you don't give us the child." (Recorded on the body cam of DeJesus, Dutra, and Edmonson).[4] Jackson understood she was required to relinquish the child at the request of CPS. Jackson understood custody of A.M. remained with Washoe County. Jackson took A.M. out on the balcony to show the authorities A.M. was sleepy but just fine.

18.     The balcony is an odd configuration, one can stand at the edge of the balcony and grasp the hand of another who is not on the balcony but standing on the hall passageway. The officer extended his hands, motioning for Jackson to extend the child over the edge. Jackson considered this for a moment but thought better of it. Jackson said, "I'll open the door and let her out but you have to move back." Jackson pulled her hands back. Jackson's hands with the child never extended over the balcony's edge. Jackson instead left the balcony, reentered her apartment, and opened the door letting the child out the front door.[5] The child was in perfect condition.

---

[4] Several voices are recorded on the body cams because the officers are standing in close proximity to each other. At this juncture it is unclear whether the recording is made by the officer wearing the body cam or someone standing next to him).

[5] The comments made by the officers caught by their body cameras reflects the officers concern that Jackson was about to lift the child over the edge and risk dropping her to the ground one story below. That is not the case, Jackson never extended the child and the videos establish that. DeJesus states in his police report that Jackson "never broke the plane of the edge of the balcony."

5

19. A social worker picked up the child as Jackson closed the door locking herself inside. An officer states: "We're normal for now." (Recorded on the body cam of DeJesus). "It's unknown if we need to get inside." (Recorded on the body cam of DeJesus).

20. The officers' body cams recorded their anger at Jackson returning to her home and denying them entry. The officers had no grounds on which to enter, but wanted to anyway. Jackson was not the subject of an investigation, not wanted for a crime, and not accused of wrongdoing.

21. Jackson asks through the closed door: "What is the issue now Sir?" Jackson does not receive an answer; the officers refuse to tell her why they are congregating outside her apartment refusing to leave.

22. The lawful purpose of the officer's presence at Jackson's residence had expired—they were present solely to assist CPS in the return of the child. That purpose had been accomplished. Jackson had opened the door and given the child to CPS. After CPS had left with the child, the officers had no legal business at the Jackson's residence. Yet the officers were mad as hell. Jackson had denied them entry, as she had a legal right to do, and they were not going to leave. One officer says: "I want to kick that fucking door down." (Recorded on the body cam of DeJesus). Another officer asks who among the officers had a "ram" to break down Jackson's door." (Recorded on the body cam of DeJesus, Edmonson and Dutra). DeJesus responds: "I have a ram." The first officer says: "Go get it." (Recorded on the body cam of DeJesus).

23. The officers did not discuss getting a warrant or their rationale for forcing an entry. The officers did not discuss what Jackson had done wrong or their legal basis for remaining outside her door. Jackson was paralyzed with fear, she was inside her apartment listening to the officers discuss breaking down her door. She had no understanding of what the officers were doing or why. Jackson was not accused of wrongdoing or the focus of a criminal investigation. No one had informed Jackson that she

had done anything wrong. Yet the officers refused to leave. The child has been removed, there was no emergency in progress, no imminent danger, and no exigent circumstances yet the officers were threatening to break the door down. While one officer ran to get a ram to break down Jackson's door another officer stated: "It is unknown if we need to get inside." (Recorded on the body cam of DeJesus). Another officer states: "We can't do a forcible entry." (Recorded on the body cam of Edmonson).

24. Jackson asked the officers through the door: "I don't know why you are here. I gave them [CPS] the child. I just want to help my son with his homework. I want your names and badge numbers." [6] ( Recorded on the body cam of DeJesus).

25. The officers discussed whether they should grab Jackson's biological son who remained inside the apartment doing his homework. The officers had no information about the son, no reason to grab him, no reasonable suspicion or probable cause—nothing. One officer said: "CPS only had papers for the small child." (Recorded on the body cam of DeJesus). Yet, the officers discussed whether they "needed to get inside" to remove Jackson's biological child—without warrant, information, or evidence Jackson's child had been harmed or was in any danger whatsoever. One officer told the others they could not take Jackson's child. He said: "The boy is hers." (Recorded on the body cam of Edmonson). Another said: "We can't do a forcible entry. The kid is fine. We may be done here. The exigency is over. (Recorded on the body cam of Edmonson). Another said: "We're good, normal for now." (Recorded on the body cam of DeJesus). Still they would not leave.

26. Meanwhile Jackson remained terrorized. She did not know what to do. The officers remained like stormtroopers outside her door milling about. Jackson telephoned 911 to ascertain what she should do. Jackson informed the 911 dispatch officer that SPD officers had come to her door to take her foster child, she had given them the foster child, but the officers were still at her door and she did not know why. Jackson is heard saying to dispatch: "I have officers at my door. I don't know why they are

---

[6] The officers refused to provide their names or badge numbers.

here. I want to finish helping my son with his homework." (Recorded on the body cam of DeJesus). The dispatch officer suggested that she go outside and talk to the officers—advising that if she went outside the officers might leave. The dispatcher said she would remain on the phone while Jackson went outside. Jackson agreed.

27. Jackson opened the door holding the phone. She says to the officers: "Did I disrespect you in any way?" An officer responds: "No, not at all." (Recorded on the body cam of DeJesus). An officer said: "Can you visit with me?" Jackson said: "No problem. Can I sit down." (Recorded on the body cam of DeJesus). The officer stood directly in front of Jackson's apartment while Jackson moved 6-10 feet away to sit on the nearby stairs.

28. Jackson politely asked the officer: "What is the issue now Sir? I don't understand why you are still here. I gave the child. I just want to help my son with his homework. I have no issues with you." (Recorded on the body cam of DeJesus). The officers attempt friendly chitchat, but they ask her no questions, make no accusations, conduct no investigation.

29. An officer told Jackson she could not return to her apartment. (Recorded on the body cam of Dutra). The officer did not provide a reason. The 911 dispatcher advised Jackson, words to the effect, that she "should be able" to return to her home. The dispatcher said she had other calls and would be getting off the phone.

30. Jackson stood up and stretched. She was standing about ten feet from her apartment, near the stairwell. Jackson said: "I am going to go back inside my house." Jackson took one step in the direction of her apartment when, without warning, she was tackled by two officers, one believed to be Dutra. One officer grabbed her right arm and the other grabbed her left. Jackson was also grabbed by the ankle and turned upside down, then dropped on to one her knee. Jackson is heard screaming in pain: "Please stop. Please stop. You're breaking my arm. You are hurting me. I didn't do anything. You

8

attacked me! I have epilepsy!" (Recorded on the body cam of Edmonson).

31. The officers are heard whispering amongst themselves while Jackson is on the ground: "We have no charges on her" and "We don't have enough on her." (Recorded on the body cam of Edmonson and DeJesus).[7]

32. An officer yells: "You had a child in your apartment that you did not have lawful custody of. (Recorded on the body cam of Dutra and Edmonson).[8] "If you had not opened the door, we would have broken it down. You were playing games with us!" (Recorded on the body cam of DeJesus and Dutra). Another said: You're not in charge. We're in charge. CPS is in charge!" (Recorded on the body cam of DeJesus and Edmonson). Still another is heard saying: "Act like a human being. All you had to do was act like a human being and do what we told you to do." (Recorded on the body cam of DeJesus).

33. Jackson says: "I am supposed to take my mother to her doctor tomorrow." An officer responds: "This is a simple misdemeanor, you'll be out in a few hours." (Recorded on the body cam of DeJesus).

34. Jackson not understanding what had happened was told: "An officer told you not to go back to your house and you tried to go back to your house. You're being arrested for obstructing." (Recorded on the body cam of DeJesus). While another officer says: "You're going to jail for kidnapping." (Recorded on the body cam of Dutra).[9]

35. Jackson was handcuffed and arrested for "obstructing." Jackson was taken to jail and booked. She remained in jail four hour to five hours and was released on her own recognizance. Jackson returned to her apartment to cry. Jackson suffered a seizure the day after her arrest. Jackson sought

---

[7] During the attack on Jackson, Dutra's body cam is turned off.

[8] This is obviously incorrect as Washoe County was paying Jackson to render foster parent care of the child.

[9] Jackson was charged with obstruction not kidnapping.

9

medical care but was unable to continue with the expensive tests and recommended course of treatment because she could not afford it.

## FIRST CAUSE OF ACTION
**Unlawful Seizure, Violation of 42 U.S.C. § 1983, a Fourteenth Amendment Violation As Against the Officers**

36. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

37. Jackson was unlawfully seized when she ordered to remain outside her apartment. Jackson was not free to leave or to walk away. The officers, by means of physical force or show of authority, restrained Jackson's liberty without lawful authority or exercise of any legal duty—the officers had no reasonable suspicion or probable cause that Jackson was involved in any criminal activity.

38. The officers came to Jackson's home without a warrant, for the sole purpose of returning Jackson's foster child to Washoe County custody—a purely civilian act not a criminal one. The officers, without justification, ordered Jackson to remain outside her home after the child had been removed and after the sole justification for their presence had dissipated. There was no investigation in progress, no complaints about Jackson, and no ongoing crime to consider. Similarly, there was no emergency in progress, no exigency, and no concern for public safety.

39. The officers admitted on their body cam recordings: We have no charges on her" and "We don't have enough on her." Yet the officers refused to let Jackson return to her apartment, refused to leave, and refuse to offer any explanations for their presence.

40. The officers were not engaged in any lawful duty. It was objectively unreasonable for the officers to order Jackson to remain outside her home simply because they told her to. To make such a demand, the officers had to be involved in a legal duty or in some lawful activity, which they were not.

41. The officers acted together, jointly, collectively, and in concert, thereby ratifying, approving, and authorizing all actions of each to the other. The actions of each were integral to the actions of all. The officers, and each of them, had a duty to intercede when seeing the

unconstitutional conduct of their fellow officers. The officers, and each of them, knew, and admitted, they had no charges against Jackson and no reasonable suspicion Jackson had committed an illegal act. Officers are not free to order law-abiding citizens like Jackson to do something or to refrain from doing something unless they are involved in a legal lawful activity. Officers cannot simply hang around outside an innocent person's residence trying to figure out how to break down the door, behaving like thugs wanting to cause trouble and havoc.

42. By the actions described above, the officers were deliberately indifferent to the constitutional wrongs inflicted upon Jackson and thereby deprived Jackson of her constitutional right to be free from unlawful seizure.

43. As a direct and proximate result of the aforedescribed willful and unlawful conduct by Defendants, committed under color of law and under police authority, Jackson suffered substantial physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of such conduct, Jackson required medical that she could not afford and still suffers from acute pain that she cannot afford to have treated. Accordingly, Jackson is entitled to damages in an amount to be determined at trial.

44. The acts of the Defendants were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's right to be free from unlawful seizure thus entitling JACKSON to an award of punitive damages against the officers..

## SECOND CAUSE OF ACTION
**False Arrest, Violation of 42 U.S.C. § 1983, a Fourth Amendment Violation As Against the Officers**

45. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

46. Jackson was charged with violation of NRS 199.280 Obstructing and Resisting a Police Officer. NRS 199.280 is violated when a person willfully resists, delays or obstructs a public officer in discharging or attempting to discharge his or her **legal** duty.

47. To constitute a violation of NRS 199.280, law enforcement must be engaged in legal activities. A person cannot obstruct an officer if the officer is not engaged in legal activities.

11

Officers may order citizens to do or to not do something if the officer has a legal purpose for the order. However, officers cannot order citizens to do or to refrain from doing when there is no legal purpose associated with the order.

48. Jackson was arrested when she took one step toward her apartment and announced her intention to reenter. The officers immediately grabbed her, pulled on her, tipped her upside down, and yelled at her words to the effect: "We told you not to return to your apartment! We are arresting you for trying to enter your apartment when we told you not to!"

49. NRS. 199.280 presupposes a lawful order. A person cannot be arrested for failing to comply with an unlawful order. Jackson's arrest for attempting to return to her apartment was unlawful because the officers had no legal authority to order Jackson to refrain from entering her apartment. For the officers to order Jackson to remain outside her apartment the officers had to have been engaged in lawful activity or to have legal justification—an investigative purpose, reasonable suspicion, something. This is the United States, not Nazi Germany. Police officers may not command innocent citizens to do this, that, or the other without legal justification. Officers represent intimidation and fear. They frighten people with their guns and commanding authority. An assemblage of officers who remain outside one's home, refusing to leave, refusing to explain their presence, while they openly discuss ways to break down the door, is terrifying.

50. Alarmingly, the officers admit that they had "no charges against Jackson" and not "enough on her" yet they issued commands at her, grabbed and manhandled her, and ultimately arrested her on a trumped up phony charge that lacked legal justification.

51. The officers acted together, jointly, collectively, and in concert, thereby ratifying, approving, and authorizing all actions of each to the other. The actions of each were integral to the actions of all. The officers, and each of them, had a duty to intercede when seeing the unconstitutional conduct of their fellow officers.

52. By the actions described above, the officers were deliberately indifferent to the constitutional wrongs inflicted upon Jackson and thereby deprived Jackson of her constitutional right to be free from false arrest.

53. As a direct and proximate result of the aforedescribed willful and unlawful conduct by Defendants, committed under color of law and under police authority, Jackson suffered substantial physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of the Defendants unlawful conduct, Jackson is entitled to damages in an amount to be determined at trial.

54. The acts of the Defendants were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's right to be free from arrest without probable cause thus entitling Jackson to an award of punitive damages.

### THIRD CAUSE OF ACTION
### Excessive Force, Violation of 42 U.S.C. § 1983, a Fourth Amendment Violation As Against the Officers

55. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

56. At or about the time Jackson was grabbed by Dutra and another officer there were seven SPD officers outside Jackson's apartment and three social workers. The officers collectively easily outweighed Jackson by more than 1000 pounds.

57. The audio portion of the body cams sound like a horror film. Jackson screamed in pain as she was grabbed and pulled by two officers. JACKSON begged the officers to stop: "Please stop. Please stop. You're breaking my arm. You are hurting me. I didn't do anything. You attacked me. I have epilepsy!" "You're hurting me, you're hurting me!"

58. Jackson did not pose a threat to the officers' safety, did not make threatening statements or gestures, and did not possess a weapon. Jackson was not a flight risk, nor did she try to flee, to run away, or to give the officers chase. The body cams are clear—Jackson did nothing to provoke the violence against her. Jackson did not receive a warning prior to the officers use of force. There was no ongoing emergency, dangerous situation in progress, or crisis requiring manage. The apartment complex was quiet.

59. The officers acted together, jointly, collectively, and in concert, thereby ratifying, approving, and authorizing all actions of each to the other. The actions of each were integral to the

actions of all. The officers, and each of them, had a duty to intercede when seeing the unconstitutional conduct of their fellow officers. The officers, and each of them, knew, and admitted, they had no charges against Jackson and no reasonable suspicion of criminal conduct.

60. By the actions described above, the officers were deliberately indifferent to the constitutional wrongs inflicted upon Jackson and thereby deprived Jackson of her constitutional right to be free from the use of excessive force.

61. As a direct and proximate result of the aforedescribed willful and unlawful conduct, committed under color of law and under the officers' police authority, Jackson suffered substantial economic loss, physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Jackson's physical pain continues and she is unable to pay for the medical treatment she now requires and which is the direct result of the excessive force. Jackson is entitled to damages in an amount to be determined at trial.

62. The acts of the Defendants were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's rights thus entitling her to an award of punitive damages as against the individual officers.

## FOURTH CAUSE OF ACTION
**Supervisor Liability, Violation of 42 U.S.C. § 1983, As Against Sergeant EDMONSON**

63. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

64. Edmonson, as a sergeant, was a supervisor. Edmonson at all times possessed the authority to restrain and control the actions of his subordinates.

65. Edmonson personally participated in the constitutional violation of Jackson's constitutional rights and was present when the unlawful acts transpired.

66. Edmonson acquiesced in the unconstitutional conduct of his officers and knowingly refused to terminate a series of acts by his subordinates, which he knew or reasonably should have known, would cause others to inflict the constitutional injuries alleged herein.

67. Edmonson's personal acts and his failure to restrain the acts of his subordinates,

deprived Jackson of her rights under the laws of the United States.

68. Edmonson knew of the constitutional violations perpetrated against Jackson and acquiesced in the unconstitutional conduct by his subordinates.

69. Edmonson disregarded the known or obvious consequences of his subordinates failure to leave Jackson's residence when he knew or should have known Jackson was accused of no crime, no wrongdoing, and could not be arrested.

70. Jackson alleges an affirmative link between Edmonson's conduct and the constitutional violations against her.

71. Edmonson's conduct was so closely related to the deprivation of Jackson's rights as to be the moving force that caused Jackson's injury.

72. Edmonson was deliberately indifferent to the deprivation of Jackson's constitutional rights.

73. As a direct and proximate result of the aforedescribed willful and unlawful conduct by Edmonson, committed under color of law and under his police authority, Jackson suffered substantial physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of Edmonson's unlawful conduct, Jackson is entitled to damages in an amount to be determined at trial.

74. The acts of Edmonson were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's constitutional rights thus entitling Jackson to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**Americans With Disabilities Act ("ADA"), Title II, Against All Officers**

75. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

76. To allege a Title II ADA claim the plaintiff must: 1) allege a disability; 2) allege he is otherwise qualified to receive the benefits of a public service, program, or activity, and 3) allege he was excluded from participation in or denied the benefits of such service, program or activity, or

otherwise discriminated against on the basis of his disability. The phrase "services, programs, or activities" encompasses virtually everything that a public entity does.

77. The ADA defines "disability" as: 1) a physical or mental impairment that substantially limits one or more major life activities of such individual; 2) a record of such an impairment; or 3) being regarded as having such an impairment. 42 U.S.C. §12102.

78. Jackson has a disability, epilepsy, a physical impairment which is neurological in origin and interferes with her major life activities. Jackson cannot work because her seizures are unpredictable and disabling.

79. Jackson was diagnosed with epilepsy in 2005 after a serious head injury. Jackson's epilepsy causes her a variety of other health issues which she controls with medication. Jackson receives government disability payments because she cannot work.

80. The officers knew or should have known Jackson was disabled because the body cam audio records Jackson screaming out at the top of her lungs: "I have epilepsy!"

81. The officers failed to accommodate Jackson, causing Jackson to suffer greater injury, humiliation and physical pain than other arrestees similarly situated.

82. The officers failed to conduct a fact specific inquiry into what accommodation Jackson required so as not to exacerbate her condition and cause a seizure. Instead, the officers lectured her that she had not behaved "like a human being" and had been "playing games" with them.

83. The officers failed to treat her pain and failed to ask if she required medication.

84. Jackson suffered a seizure within hours after her arrest.

85. The scope of ADA protections extends to arrests and general police activity.

86. The officers acted together, jointly, collectively, and in concert, thereby ratifying, approving, and authorizing all actions of each to the other. The actions of each were integral to the actions of all. The officers, and each of them, had a duty to intercede when seeing the unconstitutional conduct of their fellow officers.

87. As a direct and proximate result of the aforedescribed willful and unlawful conduct,

committed under color of law and under the officers police authority, Jackson suffered substantial economic loss, physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Jackson is entitled to damages in an amount to be determined at trial.

88. The acts of the officers were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's rights thus entitling her to an award of punitive damages as against the individual officers.

## SIXTH CAUSE OF ACTION
### First Amendment, Violation of 42 U.S.C. § 1983, As Against the Officers

89. Jackson realleges and incorporates each and every allegation contained in the preceding paragraphs.

90. To allege a First Amendment retaliation claim the plaintiff must: (1) allege engagement in constitutionally protected activity, (2) allege the defendant's actions would chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity, and (3) allege the protected activity was a substantial or motivating factor in the Defendants' conduct.

91. Jackson alleges the officers retaliated against her because she exercised her constitutionally protected right to deny entry to the officers into her home.

92. The officers became angry at Jackson after she insisted they could not enter her apartment without a warrant. The officers knew they had no legal right to forcibly enter Jackson's apartment but the officers were recorded saying: "I want to kick that fucking door down." "Who has a ram to break down the door?" After Jackson voluntarily opened the door to talk to the officers, one angrily admitted: "If you had not opened the door, I would have broken it down."

93. Jackson's speech in denying the officers entry into her home was a substantial or motivating factor in the officers retaliatory decision to use excessive force, to arrest her, and to cause her substantial bodily harm.

94. Jackson, like any similarly situated person was chilled from exercising her First Amendment right to refuse the officers entry into her home.

95. The timing of Jackson's arrest, following immediately after exercise of her constitutional rights, demonstrates a substantial causal relationship between Jackson's constitutionally protected activity and her retaliatory arrest.

96. By the actions described above, the Defendants were deliberately and recklessly indifferent to the constitutional wrongs inflicted upon Jackson and thereby deprived Jackson of her constitutional right to be free from the use of excessive force.

97. As a direct and proximate result of the aforedescribed willful and unlawful conduct, committed under color of law and under the officers police authority, Jackson suffered substantial economic loss, physical pain and emotional distress, injury to her sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Jackson is entitled to damages in an amount to be determined at trial.

98. The acts of the Defendants were intentional, wanton, malicious and oppressive and made with reckless indifference to Jackson's rights thus entitling her to an award of punitive damages as against the individual officers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1. For actual and compensatory damages from all defendants in an amount to be determined at trial;
2. For exemplary and punitive damages from all defendants in an amount to be determined at trial;
3. For attorney fees and costs incurred herein;
4. For leave to amend this complaint should same become necessary;
5. For nominal damages;

6. For such other and further relief as this Court may deem appropriate.

DATED: This 13th day of May 2020

                                                            /s/ Terri Keyser-Cooper
                                                        TERRI KEYSER-COOPER
                                                        *Attorney for Plaintiffs*