1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                           **DISTRICT OF NEVADA**
8
9   KIM JACKSON,                              )
                                              )
10              Plaintiff,                     )
                                              )
11         vs.                                 )        3:20-CV-00288-RCJ-CLB
                                              )
12  CHRIS DUTRA, JASON EDMONSON,              )        **ORDER**
    ERIC DEJESUS,                             )
13                                            )
                Defendant.                     )
14  _____  )

15         Plaintiff brings this case alleging that Defendants seized and arrested her without probable

16  cause and exceeded reasonable force in doing so. Presently before this Court are five fully briefed

17  motions: Plaintiff's Motion for Sanctions (ECF No. 37), Plaintiff's Second Motion for Partial

18  Summary Judgment (ECF No. 42), Defendants' Motion for Sanctions (ECF No. 44), Plaintiff's

19  Third Motion for Partial Summary Judgment (ECF No. 52), and Defendants' Motion for Summary

20  Judgment (ECF No. 54).

21         In her motion for sanctions, Plaintiff claims spoliation based upon Defendants muting their

22  body-worn cameras during discussions among themselves. As the evidence was never created, it

23  could not be spoliated. The Court thus denies this motion.

24  ///

As for summary judgment, the Court finds that review of the body camera footage conclusively shows that Defendants had probable cause and their force was not excessive. As such, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motions.

Lastly, Defendants move for case terminating and attorney fees sanctions against Plaintiff and her counsel, Ms. Terri Keyser-Cooper, claiming they engaged in bad faith practices in their litigation of this case and that Plaintiff spoliated text messages when she changed her phone after this case began or at least after she had determined that she would sue Defendants. As The Court grants the motion for summary judgment, the Court declines to impose case terminating or monetary sanctions.

## FACTUAL BACKGROUND

The substantive facts of this case were captured by Defendants' body-worn cameras ("BWC"). On November 1, 2018, Susan Thomas and Alexandra Clark, employees of Nevada's Human Services Agency, Child Protective Services, ("CPS") met with Defendants outside of Plaintiff's apartment. They informed Defendants of a situation involving Plaintiff and the three-year-old child (A.M.). (ECF No. 54 Ex. 1 at 03:33:26–03:36:07.)[1] The CPS agents conveyed that Plaintiff was refusing them access to A.M., who was in CPS's custody, entailing that CPS is allowed to demand the return the child at any time. (*Id.*) Specifically, Ms. Thomas told the Defendants that Plaintiff was not cooperating with CPS, was refusing to go to scheduled meetings, and Plaintiff specifically stated she would not go to a meeting with CPS on the following day, November 2, 2018. Ms. Thomas indicated her conclusion that Plaintiff's conduct was kidnapping because

///

---

[1] The Parties agree that the timestamp on the BWC footage is for another time zone, Zulu time, which is seven hours ahead of Pacific daylight savings time. (ECF No. 40 at 1 n.2.) So, while the time indicates the events took place around 4:00 am on November 2, 2021, they actually took place around 9:00 pm on November 1, 2021.

the child was legally in CPS's custody. (*Id.*) Afterward, Defendants and the CPS agents went to Plaintiff's second-story apartment. (*Id.* at 03:37:15.)

Defendant Dutra knocked on the door and spoke to Plaintiff for a few moments through the door of the apartment, asking if everything was okay and if the officers could come into the apartment. (*Id.* at 03:37:52–03:38:13.) Plaintiff then stepped onto her second-story balcony. (*Id.* at 03:38:13.) Defendant Dutra continued to speak with Plaintiff, asking again if the officers could go into the apartment, and Plaintiff declined. (*Id.* at 03:38:16–03:38:53.) Then, Plaintiff had her minor child, B.R., also come onto the balcony. (*Id.* at 03:38:56.) Defendant Dutra asked B.R. if everything was okay and briefly talked with him. (*Id.* at 03:38:56–03:39:29.) Plaintiff asked B.R. if everything was okay and if she ever hit him, and he said that she did not. (*Id.*) Then, Plaintiff said that everyone here is okay. (*Id.*) Plaintiff again declined to allow Defendants to come into her apartment, stating she has never been arrested and had no warrants. (*Id.* at 03:39:29–03:39:48.)

Ms. Thomas then asked for Plaintiff to bring A.M. out onto the balcony, and Plaintiff went inside to get her. (*Id.* at 03:39:54.) Shortly thereafter, Plaintiff came out with A.M. in her arms. (ECF No. 54 Ex. 2 at 03:40:29.) Ms. Thomas told Plaintiff that A.M. is in CPS's legal custody and asked Plaintiff to open the door. (*Id.* at 03:40:35–03:41:15.) Plaintiff stated that she would not open the door for any reason, said they agreed to meet tomorrow at eleven, and offered to give them her phone to show this was the arrangement. (*Id.*) Plaintiff then stepped inside her apartment again. (*Id.* at 03:41:20.)

About 50 seconds later, Plaintiff came onto her balcony again, alone. (*Id.* at 03:42:07.) She had her phone with her. (*Id.*) Ms. Thomas and Plaintiff began arguing with each other. Plaintiff tried to say that there was a plan for her to meet CPS late the next morning, but the CPS agents were claiming that the communications had broken down. (*Id.* at 03:42:07–03:42:55.) Defendant
///

Edmonson as the argument escalated said that Plaintiff's refusal to turnover A.M. is kidnapping. (*Id.*) Plaintiff replied, "Oh you want her?" (*Id.*) Then, Plaintiff went back inside. (*Id.* at 03:42:55.)

Plaintiff quickly returned to the balcony again with A.M. in her hands with her arms stretched out. (*Id.* at 03:43:04.) Plaintiff again asked, "You want her?" and began moving towards the railing with A.M. in her outstretched arms, on the second floor, across to Defendant Edmonson, who was standing on the landing outside the front door. (*Id.* at 03:43:05.) If Plaintiff had dropped A.M. while attempting to pass her to Edmonson, the infant would have fallen from the second story to the ground. Defendant Edmonson yelled, "Do not put her over the rail!" (*Id.* at 03:43:05–03:43:06.) Defendant Dutra ran down the stairs to be on the ground below the balcony. (ECF No. 54 Ex. 1 at 03:43:06–03:43:16.) Plaintiff then stated, "I am not opening my door though." (ECF No. 54 Ex. 2 at 03:43:08.) She then said, "As you can see, your hand is right here. You can grab her." (*Id.* at 03:43:12.) Defendants and the CPS agents all told her that it was not safe for them to get A.M. by passing her over the railing, and Plaintiff went back into the apartment with A.M. (*Id.* at 03:43:13–03:43:27.) Defendant Edmonson then ordered Defendant Dejesus to get a ram from his vehicle.[2] (*Id.* at 03:43:30.)

Plaintiff then said that she would put A.M. outside of the door if Defendants and the CPS agents would back away from it. (*Id.* at 03:43:42.) Defendants agreed and stated they would use a ram to break the door down if she did not. (*Id.* at 03:44:01.) Defendants backed away, and Plaintiff opened her front door slightly such that A.M. walked  through the doorway and then Plaintiff quickly shut the door behind A.M. (*Id.* at 03:44:05–03:44:15.) Then, Ms. Clark grabbed A.M. and went away to the police cars. (*Id.* at 03:44:15.) Shortly thereafter, Defendants Dejesus and Dutra returned to outside the front door, and Defendant Edmonson ordered them to stay there and to

---

[2] At oral argument, Defendants argue that this comment spurred Plaintiff into opening the door to them. The Court does not adopt this conclusion as it is unclear from the BWC footage whether Plaintiff heard this statement.

"keep an eye on this," while he returned to the vehicles with the CPS agents and A.M. (*Id.* at 03:44:15–03:44:56.)

Plaintiff called 911 and spoke to a dispatcher. (ECF No. 54 Ex. 4 at 82:17–83:17.) She says the dispatcher said if she went outside that Defendants might leave. (*Id.*) After a few minutes, Plaintiff came out while on the phone with the dispatcher and locked the door behind her, saying "Let me lock the door because I do not want you in my house at all." (ECF No. 54 Ex. 3 at 03:48:44–03:48:50.) She pointed at Defendant Dutra and said that he "was the one that beat me up." (*Id.* at 03:48:53–03:49:03.) After briefly speaking to Plaintiff, Defendant Dutra moved past Plaintiff and positioned himself in front of her door. (*Id.* at 03:49:00–03:49:17.) While standing between the front door and Plaintiff, Defendant Dutra told Plaintiff "Now you get to stay out here and visit with me now." (*Id.* at 03:49:19–03:49:22.) Plaintiff then responded, "No problem sir, I came out to visit with you." (*Id.* at 03:49:23–03:49:26.) Plaintiff then told Defendants, "Let me sit down so you guys know I'm not trying to get away from you," and Plaintiff sat down on the stairs that go up to the third floor. (*Id.* at 03:49:30–03:49:35.) Defendant Dutra continued to stand between Plaintiff and the door and Defendant Dejesus stood a couple steps above her on the stairs. (*Id.*) While Plaintiff was sitting on the stairs talking into her phone with the dispatcher, Defendant Dutra told dispatch, "You can hang up with her." (*Id.* at 03:49:36–03:49:59.) A voice over the radio stated, "aww we did." (*Id.* at 03:50:00–03:50:03.) Plaintiff then says, "Oh, in that case, I'm gonna go back in my house." (*Id.* at 03:50:03–03:50:06.) While saying this, Plaintiff got up from the stairs and quickly walked over to the railing outside her door. (*Id.*) Plaintiff then attempted to climb over the railing by lifting her right leg over it. (*Id.* at 03:50:03–03:50:08.)

Defendant Dutra immediately grabbed Plaintiff's upper body and Defendant Dejesus grabbed Plaintiff's right leg, and Defendant Dutra said, "Put her in handcuffs." (*Id.* at 03:50:11–03:50:13.) Plaintiff then began struggling and screaming. (*Id.* at 03:50:14–03:50:17.) Defendant

Dejesus told Plaintiff multiple times to stop. (*Id.* at 03:50:14–03:50:19.) Defendant Dejesus also attempted to put Plaintiff's right arm behind her back. (*Id.*) Plaintiff continued to struggle with Defendants Dejesus and Dutra and finally sat on the ground. (*Id.* at 03:50:14–03:50:32.) At that point, Defendant Dejesus was able to get Plaintiff's right arm behind her back. (*Id.* at 03:50:41.)

Seconds later, Defendant Edmonson arrived inquiring what is happening and stated that "at this point, we do not have any charges on her." (*Id.* at 03:50:46.) Defendant Dutra told Defendant Edmonson, "She came out, and I wouldn't let her back in the house." (*Id.* at 03:50:41–03:50:44.) Defendant Dejesus told Defendant Edmonson, "She tried jumping over the fence to get back in." (*Id.* at 03:51:04–03:51:07.) Plaintiff responded to Defendant Dejesus' comment by saying "because you guys were trying to attack me." (*Id.* at 03:51:09–03:51:011.) During the conversation, Defendant Dejesus confronted Plaintiff with her attempt to jump over the railing by saying, "You just tried jumping over the fence. You think I'm going to let you jump over the fence?" (*Id.* at 03:53:24–03:53:29.) Defendant Edmonson then told Plaintiff, "Like you almost tried to hand a baby over the fence." (*Id.* at 03:53:29–03:53:32.) Plaintiff did not deny that she tried to jump over the fence but, in apparent response to Defendant Edmonson's statement, asserted, "Now again, I said I was wrong for that" while looking at Defendant Edmonson. (*Id.* at 03:53:33–03:53:36.)

Over the next several minutes, Defendants walked away and talked amongst themselves with their microphones muted to not record their dialogue as Plaintiff was sitting handcuffed speaking with another agent that showed up to the scene, Officer Taylor. (ECF No. 54 Ex. 1 at 03:54:23–03:58:36.) After the private meeting, Defendant Edmonson told Plaintiff that she was instructed twice not to return to her home. Plaintiff was then arrested, transported to the Washoe County Jail, and booked into the holding facility. (ECF No. 54 Ex. 2 at 04:01:16–04:43:51). She was charged with violating Nev. Rev. Stat. § 199.280, resisting public officer, for, among other things, attempting to flee officers while being detained and failing to obey lawful commands.

## ANALYSIS

### I.     *Plaintiff's Motion for Sanctions (ECF No. 37)*

The Court begins its analysis by addressing Plaintiff's motion for sanctions. She claims Defendant spoliated evidence. Specifically, she complains Defendants muted their body-worn cameras after they placed Plaintiff in handcuffs and walked away from her to talk privately amongst themselves, while she was talking to Officer Taylor whose BWC recorded Plaintiff and their conversation. She further contends their muting of the cameras was in violation of the Constitution, Sparks Police Department policy, and Nev. Rev. Stat. § 289.830.

As of December 2015, Federal Rule of Civil Procedure 37(e) provides the specific—and only[3]—basis for sanctions for spoliation of electronically stored information ("ESI"), which was substantially amended to accommodate advances in technology and provide uniformity among the circuits. To succeed on this motion, the moving party must prove the following three elements:

1.     The nonmoving party should have preserved the ESI in the anticipation or conduct of litigation.

2.     The nonmoving party lost the ESI because it failed to take reasonable steps to preserve it.

3.     Additional discovery cannot restore or replace the ESI.

Fed. R. Civ. P. 37(e). The first element incorporates the common-law rule that imposes a duty to preserve evidence in litigation and when litigation is reasonably foreseeable. Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment; *see Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 981 (9th Cir. 2009). Second, the rule requires that the party takes reasonable steps

---

[3] Plaintiff also moves for sanctions under the Court's inherent authority. However, the Advisory Committee Notes make clear that the 2015 amendment forecloses a court from imposing sanctions for spoliation of ESI under that basis. *Newberry v. Cty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018) (holding that the 2015 amendment to Rule 37(e) "foreclose[d] reliance on inherent authority" for sanctioning spoliation of ESI) (quoting Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment).

to preserve the ESI—not perfection. Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment. Third, the rule acknowledges that ESI is often stored in many formats on many systems contemporaneously, so the deletion of ESI on one medium may result in no loss of information, when the ESI is producible by other means. *Id.*

When a moving party satisfies these three prerequisites, two kinds of sanctions are available, but each requires proof of an additional element. Fed. R. Civ. P. 37(e). On the one hand, if the spoliation prejudiced the moving party, then the Court may order measures no greater than necessary to cure the prejudice. *Id.* On the other hand, harsher sanctions are available if the moving party shows that the nonmoving party acted with the intent to deprive the moving party of the information's use in the litigation. In that circumstance, the Court may (1) presume that the lost information was unfavorable to the party, (2) instruct the jury that it may or must presume the information was unfavorable to the party, or (3) dismiss the action or enter a default judgment. *Id.*

Plaintiff's motion is fatally defective because the evidence was not lost—it was never collected. "One of the elements of a spoliation claim is that the party must demonstrate the evidence actually existed and was destroyed." *Fernandez v. Centric*, No. 3:12-CV-00401-LRH, 2014 WL 2042148, at *9 (D. Nev. May 16, 2014); *see also, e.g.*, *Conan v. City of Fontana*, No. EDCV 16-1261-KK, 2017 WL 3530350, at *4 (C.D. Cal. Aug. 16, 2017) ("[T]he law does not impose a duty on parties to civil litigation to collect evidence for the opposing party."); *Fowler v. Wal-Mart Stores, Inc.*, No. 2:16-CV-450-JCM-GWF, 2017 WL 3174915, at *3 (D. Nev. July 26, 2017) ("The law does not impose a duty . . . to create photographic evidence . . . ."); *Creighton v. City of New York*, No. 12 CIV. 7454 (PGG), 2017 WL 636415, at *17 (S.D.N.Y. Feb. 14, 2017) ("Spoliation sanctions are applicable only when a party loses or destroys evidence, [however,] not when he or she fails to collect it." (quoting *Sachs v. Cantwell*, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *9 (S.D.N.Y. Sept. 4, 2012)) (alteration in original).). Plaintiffs fail to point to a single

case to the contrary where a court imposed a duty to collect evidence for the opposing party under Fed. R. Civ. P. 37(e).

Plaintiff seeks to avoid this conclusion by arguing that Defendant violated their duties under the Constitution, Sparks Police Department policy, and Nev. Rev. Stat. § 289.830. The Court is not persuaded that these various laws alter the law that there is no duty to collect evidence for an opposing party in a civil case universally adopted by the courts nor is it even persuaded that Defendants actually violated these various laws. Police officers only have a limited duty to collect *exculpatory* evidence under the Fifth Amendment to the Constitution for a criminal case; there is no duty to record conversations amongst the police officers themselves. *See United States v. Martinez-Martinez*, 369 F.3d 1076, 1086 (9th Cir. 2004). Nev. Rev. Stat. § 289.830 provides:

> A law enforcement agency shall require uniformed peace officers that it employs and who routinely interact with the public to wear a portable event recording device while on duty. Each law enforcement agency shall adopt policies and procedures governing the use of portable event recording devices, which must include . . . prohibiting deactivation of a portable event recording device until the conclusion of a law enforcement or investigative encounter . . . .

The Court finds that Defendants walked away from Plaintiff (who remained with Officer Taylor) so that they could have a discussion amongst themselves. As this occurred after the conclusion of the Defendants' law enforcement encounter with Plaintiff, this statute was not violated. Lastly, the Sparks Police Department policy for cameras specifically notes that "[BWCs] shall not be used to record . . . Investigative briefings, discussions and tactics (to include patrol-based investigations) . . . ." (ECF No. 37-7 at 7–8.) The Court likewise finds that Defendant did not need to record their conversations under this exception of the policy. As no audio recording of the conversation was destroyed, and as there was no duty for Defendants to record their conversation, this motion must therefore fail.

///

## II.  *Competing Motions for Summary Judgment (ECF Nos. 42, 52, 54)*

Plaintiff raised six causes of action: Count I – Unlawful Seizure (against all Defendants), Count II – False Arrest (against all Defendants), Count III – Excessive Force (against all Defendants), Count IV – Supervisory Liability (against Defendant Edmonson), Count V – Violation of the American with Disabilities Act (against all Defendants), and Count VI – First Amendment Retaliation (against all Defendants). (ECF No. 1.) Plaintiff has voluntarily dismissed Counts V and VI. (ECF Nos. 35, 36.) Counts I and II are based on Plaintiff's contention Defendants lacked probable cause to arrest her on the night of November 1, 2018. For Count III, Plaintiff contends that Defendants Dutra and Dejesus used more than necessary force in her arrest. In Count IV, Plaintiff claims that Defendant Edmonson is responsible for the actions of Defendants Dutra and Dejesus as their supervisor. In light of the BWC footage, the Court finds no reasonable juror could find in favor of Plaintiff on any of the four remaining claims and therefore grants Defendant's motion for summary judgment and denies Plaintiff's competing motions.

A court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only facts that affect the outcome are material. *Id.*

To determine when summary judgment is appropriate, courts use a burden-shifting analysis. On the one hand, if the party seeking summary judgment would bear the burden of proof at trial, then he can only satisfy his burden by presenting evidence that proves every element of his claim such that no reasonable juror could find otherwise assuming the evidence went uncontroverted. *Id.* at 252. On the other hand, when the party seeking summary judgment would not bear the burden of proof at trial, he satisfies his burden by demonstrating that the other party failed to

establish an essential element of the claim or by presenting evidence that negates such an element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (Brennan J., concurring). A court should deny summary judgement if either the moving party fails to meet his initial burden or, if after he meets that burden, the other party establishes a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

> ### A.      Defendants had probable cause to arrest Plaintiff.

Defendants have offered three crimes as to which, they assert, an objective officer would have probable cause to arrest Plaintiff. "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *O'Doan v. Sanford*, 991 F.3d 1027, 1039 (9th Cir. 2021) (internal citation and quotation marks omitted). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (internal citation and quotation marks omitted). "This is not a high bar." *Id.* (internal citation and quotation marks omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). An officer's subjective intent and beliefs are irrelevant. *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) ("[T]he subjective intentions of the officer did not make the continued detention of respondent illegal under the Fourth Amendment.").

Defendants first point to the crime of attempted child endangerment. Nevada's criminal statute for child endangerment is Nev. Rev. Stat. § 200.508, which reads, in relevant part:

> 1. A person who willfully causes a child who is less than 18 years of age . . . to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect . . . If substantial bodily or mental harm does not result to the child: If the person has not previously been convicted of a violation of this section or of a violation of the law of any other jurisdiction that prohibits the

same or similar conduct, is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 6 years.
. . .
2. A person who is responsible for the safety or welfare of a child pursuant to NRS 432B.130 and who permits or allows that child . . . to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect . . . If substantial bodily or mental harm does not result to the child: If the person has not previously been convicted of a violation of this section or of a violation of the law of any other jurisdiction that prohibits the same or similar conduct, is guilty of a gross misdemeanor.

For an attempt, "An act done with the intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime." Nev. Rev. Stat. § 193.330.

Defendants correctly contend that probable cause to arrest Plaintiff for attempted child endangerment because, while standing on her second-story balcony, Plaintiff walked towards the Defendants with A.M. in her outstretched arms, and asked Defendants if they wanted A.M. Defendants could reasonably conclude that Plaintiff was attempting to pass A.M. from the balcony to the landing and would have done so if they had not immediately yelled at Plaintiff to stop. Further evincing Plaintiff's intention at that moment, she then stated to Defendant Edmonson, "As you see, your hand is right here, you can grab her." The Court readily finds that the attempted act of passing A.M. from Plaintiff's balcony to the landing outside Plaintiff's front door of her apartment would have "placed [A.M] in a situation where the child may suffer physical pain or mental suffering."

Plaintiff argues against this conclusion because it is contrary to the subjective intent of the officers at the time of the arrest. She points to the fact that Defendant Edmonson said there was nothing to charge against her during the arrest. She points to the deposition of Defendant Dutra, where he said that he did not witness an act of child endangerment. (ECF No. 58 Ex. 1 at 137.) She points to the fact that she was not charged with child endangerment but obstruction. All of these facts are, however, irrelevant to whether an objective officer would have probable cause to

arrest Plaintiff for attempted child endangerment based on her conduct. Therefore, Plaintiff's arguments fail to alter this Court's conclusion that Defendants had probable cause that Plaintiff committed an attempted child endangerment.

Defendants next argue there was probable cause to believe that Plaintiff committed either an attempted or actual kidnapping of A.M. Nev. Rev. Stat. § 200.310 is the criminal statute for kidnapping in Nevada; it states:

> 1. A person who . . . detains any minor with the intent to keep, imprison, or confine the minor from his or her parents, guardians, or any other person having lawful custody of the minor . . . is guilty of kidnapping in the first degree which is a category A felony.

> 2. A person who willfully and without authority of law seizes, inveigles, takes, carries away or kidnaps another person with the intent to keep the person . . . in any manner held to service or detained against the person's will, is guilty of kidnapping in the second degree which is a category B felony.

The Court is les persuaded by this argument. A much closer question exists over whether the bodycam tapes establish—objectively—that a kidnapping or attempted kidnapping occurred. The Court therefore declines to resolve this question as the tapes clearly establish an attempted child endangerment.

Lastly, Defendants argue they had probable cause to arrest Plaintiff for attempting to flee from Defendants after being lawfully detained. Nev. Rev. Stat. § 199.280 criminalizes such conduct; it states:

> A person who, in any case or under any circumstances not otherwise specially provided for, willfully resists, delays or obstructs a public officer in discharging or attempting to discharge any legal duty of his or her office shall be punished . . . [w]here no dangerous weapon is used in the course of such resistance, obstruction or delay, for a misdemeanor.

"In Nevada, every citizen has a duty to peacefully submit to an arresting officer, or face punishment by fine and imprisonment." *Gonzalez v. Las Vegas Metro. Police Dep't*, 2014 WL 1091012, at *14 (D. Nev. Mar. 18, 2014). Section 199.280 makes a wide range of actions that obstructs

officers in the performance of their duties a crime. *See, e.g.*, *Starr v. State*, 433 P.3d 301, 304 (Nev. Ct. App. 2018) (fleeing a crime scene may violate Nev. Rev. Stat. § 199.280).

After Plaintiff released A.M. to Defendants, Defendants Dutra and Edmonson waited outside her residence. While there, Plaintiff came outside while on the phone with 911 and accused Defendant Dutra of beating her up. (ECF No. 54 Ex. 1 at 03:48:42–03:48:59.) They spoke briefly, then Defendant Dutra moved in between her and the front door, stating, "Now you get to stay out here and visit with me." (*Id.* at 03:49:19–03:49:21.) Plaintiff responded, "No problem, sir. I came out to visit with you. . . . Let me sit down so you guys know I'm not trying to get away from you." (*Id.* at 03:49:22–03:49:32.) While saying this, she walked towards and sat down on the stairs approximately ten feet from the front door of her apartment in between Defendants Dutra and Dejesus. (*Id.*) After a few moments, while on the stairs and after 911 had hung up on Plaintiff, she said "Oh, in that case, I'm gonna go back in my house." (*Id.* at 03:49:32–03:45:06.) While saying this, she quickly stood up, took several steps towards her residence, and began climbing over the railing as if to jump from there to her balcony. (*Id.*) Defendants Dutra and Dejesus grabbed her from each side while her right leg was already over the railing. (*Id.* at 03:50:06–03:50:11.) Defendant Dutra then stated, "Put her in handcuffs." (*Id.* at 03:50:12.) Plaintiff did not willingly allow Defendants to put her in handcuffs and started screaming "Please stop" and "You are hurting me." (ECF No. 54 Ex. 2 at 03:50:12–03:50:37.) The video from Defendant Dejesus's body camera shows that they were struggling with her to get her hands behind her back. (*Id.* at 03:50:31–03:50:37.) During the course of this physical encounter, Defendants Dutra and Dejesus repeatedly told her to stop. (*Id.* at 03:50:12–03:50:37.)

The Court agrees with Defendants. They did lawfully detain Plaintiff when Defendant Dutra told her to visit with him and positioned himself between her and the door. The detention was lawful because an objective officer could form the reasonable suspicion that Plaintiff had violated

Nevada's criminal statute criminalizing child endangerment. *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020) ("[P]olice officers may conduct a brief, investigative stop of an individual when they have reasonable suspicion that the person apprehended is committing or has committed a criminal offense. We examine the totality of the circumstances to determine whether a detaining officer has a particularized and objective basis for suspecting criminal wrongdoing." (interna citations and quotation marks omitted)). As they had probable cause to arrest Plaintiff, as discussed above, they had reasonable suspicion to detain her.

After this detention, Plaintiff attempted to flee back into her apartment as evidenced by her walking towards her residence and climbing the railing, while simultaneously stating her intent to return to her apartment. Plaintiff was then physically apprehended by Defendants, where she continued to resist their commands to stop. The Court therefore finds that Defendants also had probable cause to arrest Plaintiff that night for violating Nev. Rev. Stat. § 199.280.

In sum, the Court agrees with Defendants that no reasonable juror could find that Defendants did not have probable cause to arrest Plaintiff on both the charge of attempted child endangerment and obstructing a police officer, either charge is sufficient in itself to make the arrest lawful. The Court therefore grants summary judgment in favor of Defendants on the claims that she was unlawfully arrested in Counts I and II.

### B.      Plaintiff has failed to show how Defendants' force was excessive.

Now the Court turns to Plaintiff's claim that Defendants' force was excessive. Plaintiff claims that Defendants Dutra and Dejesus used excessive force by carrying her off the railing and attempting to pull her wrist behind her back to place her in handcuffs. The Court disagrees and rules in favor of Defendants for this claim as well.

The Fourth Amendment does not prohibit the use of reasonable force by police officers— only excessive force. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of

a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "[P]olice officers who confront actual (or perceived) resistance are only permitted to use an amount of force that is reasonable to overcome that resistance." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013). A list of factors for courts to considered in this analysis are the following: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017). Under the first factor, the Ninth Circuit also considers the severity of the situation unfolding in general. *Ames v. King Cty., Washington*, 846 F.3d 340, 349 (9th Cir. 2017) ("[W]e believe the better analytical approach here under the first *Graham* factor should be to focus our inquiry not on Ames's misdemeanor crime of obstruction but instead on the serious—indeed, life-threatening—situation that was unfolding at the time. Ames was prolonging a dire medical emergency through her disregard of Deputy Volpe's lawful commands, and her actions risked severe consequences.").

The nature of the force Defendants perpetrated upon Plaintiff is largely undisputed; Defendants Dutra and Dejesus grabbed her off the railing, briefly carried her away from the railing, and attempted to pull her hands behind her back to handcuff her. Plaintiff contends they pulled her "arm in a manner that feels like it's going to be broken." (ECF No. 58 Ex. 8, ¶ 7). The Court finds that this force cannot be reasonably construed by a juror as excessive.

In the situation, Defendants were reasonable to believe that Plaintiff was attempting to flee from Defendants by jumping from the second-story railing to get back in her apartment because Defendant Dutra was in front of her door. This belief was reasonable because she began walking to her apartment, stated her intent of going into her apartment, put her leg over the railing in an apparent attempt to jump to her balcony. While Plaintiff now swears that she did not intend to

jump to her balcony from the railing, (ECF No. 58 Ex. 8 ¶ 1), (even though Plaintiff did not dispute such an intent later in the BWC footage), Defendants were reasonable to believe she was attempting to do so, based on the information they had at the time. Grabbing Plaintiff, taking her away from the railing, and attempting to pull her arm back to put her into handcuffs to restrain her by putting her under arrest and prevent her from jumping off the second-story railing is reasonable force.

Applying these facts to the factors shows the force was reasonable: First, Defendants witnessed facts evincing probable cause that Plaintiff had attempted child endangerment and had attempted to flee from a lawful detention as the Court discussed above. Second, Plaintiff presented a significant risk to herself based on Defendants' reasonable belief she was attempting to jump from her railing to her second-story balcony. In her denial of her attempt to jump in her deposition, she acknowledges the inherent risk of such an act. (ECF No. 58 Ex. 8 ¶ 1 ("The rail was two stories up. I never intended to jump over the railing because I would have been killed. I am not suicidal.").) Third, based upon Plaintiff's statement and climbing over the railing, Defendants were reasonable to believe Plaintiff was attempting to flee. All of the factors therefore show that Defendants' minimal force of taking her away from the railing and to restrain her with handcuffs was reasonable in light of the circumstances.

Attempting to show the force was excessive, Plaintiff posits "she now has a 'slap tear' and faces surgery" as a result of the Defendants' force. (ECF No. 58 at 17.) Plaintiff has no admissible evidence for the Court to consider such a diagnosis. She presents unauthenticated reports from Maria Cecilia Brady and Reno Diagnostic Centers. (ECF No. 58 Exs. 6, 7.) "It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988); *see also Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202 (D. Nev. 2008) (holding that

unsworn expert reports could not be considered for summary judgment). They are merely pur-
ported to be "true and accurate" by Plaintiff's litigation counsel, which is ineffectual. *Shuffle Mas-
ter, Inc.*, 553 F. Supp. 2d at 1209 ("Ninth Circuit law is clear that a document cannot be authenti-
cated merely by way of an attorney's declaration that states that the document is 'true and correct.'"
(quoting *Beyene*, 854 F.2d at 1182)). Furthermore, even if she did present admissible evidence of
such an injury, that evidence would not raise a triable issue in the circumstances of this case that
the amount of force used was unreasonable. *See, e.g.*, *Ames*, 846 F.3d at 351 (affirming a finding
that force was reasonable despite the plaintiff suffering a back injury).

In sum, the Court finds summary judgment is appropriate in favor of Defendants for all
underlying claims: unlawful seizure, false arrest, and excessive force. Based upon this conclusion,
the Court also finds summary judgment is appropriate for the cause of action for supervisory lia-
bility against Defendant Edmonson as there is no underlying claim for which to base the cause of
action. The Court therefore grants Defendant's motion for summary judgment and denies Plain-
tiff's two motions for summary judgment.

### III.    *Defendant's Motion for Sanctions (ECF No. 44)*

Defendant moves for case terminating sanctions and attorney fees for spoliation of evi-
dence and other misconduct of Plaintiff and her counsel, Ms. Terri Keyser-Cooper. As the motions
for summary judgment became fully briefed before this Court considered the present motion for
sanctions, the Court declines to consider whether case terminating sanctions are appropriate, and
only assesses whether attorney fees should be granted. Before turning to the merits of the motion,
the Court will first relay additional facts specific to this motion, then address the claim of spoliation
before turning to other allegations of misconduct.

///

///

1    **A.     Pertinent Facts**

2          At some point between the incident on November 1, 2018 and the filing of Defendants'

3    motion for sanctions on April 30, 2021, Plaintiff switched phones and lost text messages between

4    her and the CPS officials. During discovery, on November 16, 2020, Defendants sought production

5    of the full text message conversation, requesting, "Please provide any emails and text message

6    correspondence with any person related to the underlying facts and circumstances concerning this

7    lawsuit including . . . correspondence with CPS." (ECF No. 44 Ex. 9 at 4.) On December 11, 2020,

8    Plaintiff responded, "All text messages from the time of the incident, with the exception of one

9    (which is attached) were deleted when Plaintiff obtained a new cell phone." (ECF No. 44 Ex. 13

10   at 6.)

11         Defendants then served the following interrogatory: "Please identify when you received a

12   new cell phone and allegedly lost all communication with CPS or anyone else related to THIS

13   CASE?" (ECF No. 44 Ex. 18.) On February 8, 2021, Plaintiff responded, "Plaintiff believes she

14   received a new cell phone on her birthday in November 2020. The new cell phone was given to

15   her by her niece." (*Id.*) Plaintiff's birthday is November 26. (ECF No. 44 Ex. 13 at 17 of 39.)[4]

16   November 26, 2020 is more than six months after this case was filed and is ten days after Defend-

17   ants requested the production of the text messages. (*See* ECF No. 1 (dated May 18, 2020).)

18         A month later, in a supplemental interrogatory response, Plaintiff stood by her contention

19   that she acquired the new phone in November 2020. Defendants inquired, in Interrogatory No. 15,

20   "Please explain how you kept one text message communication with CPS, specifically Alexandra

21   Clark, but failed to keep any other communication between you and CPS." (ECF No. 44 Ex. 33 at

22   3.) Plaintiff responded, on March 12, 2021:

23

24   ───────────────
[4] This exhibit contains multiple documents, so the Court uses the page number imprinted by the
Court's filing system.

> At the time the text messages were sent, Plaintiff had them all. At the time Plaintiff consulted an attorney she understood that particular text message would be important and gave a copy of that text message to her attorney. Afterwards, after giving that specific message to her attorney, Plaintiff got a new phone as a birthday present and her old phone with all the other text messages was traded in for value. She did not delete the messages or seek to destroy them. When a relative gave her the new phone she simply traded in her old phone. On the night of the subject incident, Plaintiff offered to show her phone to the officers and to CPS to prove that she had been communicating with CPS all day. Plaintiff has never intentionally deleted any phone or text messages.

(*Id.* at 4.) And Defendants asked in Interrogatory No. 17, "Please describe why you only retained one text message communication with CPS when you received a new phone approximately 6 months after filing your lawsuit." (*Id.*) She replied:

> Please see Response to Interrogatory No. 15. Also, on the Body Worn Cameras Plaintiff on the night of the incident offered to give her cell phone to the officers show [sic] that she could prove that not only was there a meeting with CPS the next day but that she had also been in communication with CPS all that day. Please check the BWC for proof that Plaintiff offered provide her cell phone to the officers and they, and CPS, rejected her offer. Had Defendants looked at her cell phone, as she offered, they would have seen all her text messages to CPS.

A couple of months after Plaintiff's interrogatory response, Defendants filed the instant motion seeking sanctions for spoliation in April 2021. (ECF No. 44.) On May 3, 2021, Defendants deposed Plaintiff. (ECF No. 50 Ex. 4.) She was asked when she got a new phone and lost the messages, and she responded, "I don't remember years too good, but I know I had the phone for a little while. Probably maybe – I don't want to give you years because I don't remember good, and I don't want them to think I'm lying because I don't remember." (*Id.* at 65.)

Ten days later, Plaintiff responded to the motion for sanctions. For this response, Plaintiff filed an affidavit dated May 13, 2021 claiming, "In November 2019, **more than one year after the incident**, I received a new iPhone as a birthday gift from my niece." (ECF No. 48 Ex. 3 ¶ 1 (emphasis in original).) She goes on to claim this was before she filed a suit or even contacted Ms. Keyser-Cooper. (*Id.*) In her response brief, Plaintiff never attempts to explain why she affirmed in

her prior discovery responses that she got the phone in November 2020 and again failed to correct this date in supplemental interrogatories. (ECF No. 48.) In sum, she now maintains without reservation this November 2019 date despite affirming in discovery responses the date was November 2020 and claiming inability to remember just ten days prior in her deposition.

Ms. Keyser-Cooper also filed an affidavit, which states she has "personal knowledge" that Plaintiff only had one screenshot of text messages with CPS officials. (ECF No. 48 Ex. 8 ¶¶ 1, 3.) Ms. Keyser-Cooper further attests under penalty of perjury to the following:

> At the time of our meeting, she did not have any of the other text messages she had exchanged with Ms. Clark. At the time of our meeting, she was using an Apple iPhone that she had been given in late November 2019 on her birthday. Ms. Jackson informed me that when she received her new iPhone, she had been able to transfer over the "contacts" from her previous Android phone but had been unable to transfer over the text messages. Thus, she had no record of any other text messages from Ms. Clark.

(*Id.* ¶ 4.) It is concerning to this Court that Ms. Keyser-Cooper is claiming to have personal knowledge of these facts as they purportedly did not meet until March 2020.

In her affidavit, Ms. Keyser-Cooper also described how they would answer discovery requests. She attests:

> I would call Ms. Jackson and tell her about the requests, and then email to her the discovery requests. Then we would go over them together and she would answer the questions to the best of her ability. I would type up what she told me and then send back to her the typed responses for her review. She would approve the responses and then I would send them to Defendants. Both of us did our best to be as accurate as possible.

(*Id.* ¶ 7.) It is further concerning to this Court that with all of these purported checks, Ms. Keyser-Cooper and Plaintiff were unable to verify the correct date at which she supposedly acquired the new phone and lost her prior text messages.

Ms. Clark from CPS also swears by affidavit that she also failed to retain the text messages. (ECF No. 44 Ex. 38.) She states:

Throughout my time as a case worker related to Ms. Jackson, I received dozens of text messages from Ms. Jackson. I received multiple text messages on November 1, 2018 from Ms. Jackson. I did not retain these messages due to the passage of time and do not recall verbatim what our text messages stated; however, I do recall that Ms. Jackson and I were communicating via text message regarding the child and the November 2, 2018 meeting.

(*Id.* ¶¶ 9–11.)

On a number of occasions, Plaintiff, assisted by Ms. Keyser-Cooper, made statements to this Court that were clearly contradicted by the evidence available to them at the time. Plaintiff further swore in her affidavit dated May 13, 2021 that she only had the one text message she attached to her summary judgment motion because it was a screenshot, and it was the only one she took. (ECF No. 48 Ex. 3 ¶ 6.) In another discovery request, Defendants sought the following from Plaintiff:

Provide any electronic communication wherein you are discussing the facts and circumstances of the SUBJECT INCIDENT, which includes but is not limited to, emails, text messages, iMessages, messages through Short Message Service, messages through Multimedia Messaging Service, social media posts, Facebook posts, Instagram posts, YouTube videos, electronic communication via social media websites or phone applications, videos of the SUBJECT INCIDENT, and videos of you discussing the SUBJECT INCIDENT.

(ECF No. 44 Ex. 31 at 3–4.) She responded, "Plaintiff does not have electronic documents discussing this incident that she has in her possession. Plaintiff has acquired a new phone." (*Id.* at 4.) In contrast to these affirmations, Defendants have attached screenshots of Plaintiff's Facebook profile, wherein she discusses the incident and includes an additional screenshot of Plaintiff's text messages with CPS officials. (ECF No. 44 Ex. 36.) In these posts, Plaintiff discussed suing Defendants and others citing various laws as a basis for an impending lawsuit. (*Id.*) In her deposition, she admitted to these posts, and further acknowledged that she sent private messages, which were never produced further contradicting her prior response to Defendants' request for production. (ECF No. 50 Ex. 4 at 157.)

1    In support of her first motion for summary judgment in which she attached the BWC videos

2    of Defendants Dutra, Dejesus, and Edmonson, Plaintiff signed another affidavit dated July 13,

3    2020, stating:

4        I had no intention of going over the railing. If I had jumped over the railing I would
         have fallen to my death. I am not an acrobat. I cannot fly on the trapeze. There was
5        nowhere for me to go other than to fall to my death. I was not suicidal and I had no
         wish to drop to my death or incur very serious injury.

6

7    (ECF No. 13 Ex. 12 ¶ 39.) This is despite the BWC videos showing Plaintiff's leg over the railing,

8    her contemporaneous statement that she was going to go into her house, and her admissions of

9    such intent moments after the attempt.

10       The Court pointed out the inconsistency between Plaintiff's testimony and the BWC videos

11   in its order denying the first motion for summary judgment. (ECF No. 30 at 4 ("Plaintiff contradicts

12   what the body camera footage appears to show . . . .").) Additionally, on August 10, 2020, Defend-

13   ant served Initial Disclosures on Plaintiff, which included among other things, the video from Of-

14   ficer Taylor's BWC. (ECF No. 44 Ex. 3.) In this video, Officer Taylor asks Plaintiff if she "tried

15   to jump over the rail?" (ECF No. 44 Ex. 5 at 03:59:36–03:59:45.) Plaintiff responded, "After they

16   started acting like they were going to beat me up or something, *yes, I tried to get back in my house*."

17   (*Id.* (emphasis added).) In spite of this Court's order and the additional video, Plaintiff still main-

18   tains that she never attempted to jump onto her balcony. In her latest filing, on July 14, 2021,

19   responding to Defendants' motion for summary judgment, she attached an affidavit stating the

20   following:

21       I was hurt by Officers Dutra and Dejesus after I stated I would be returning to my
         apartment. I stretched, took two steps, and was grabbed. By [sic] Officer Dutra. I
22       grabbed a nearby rail to stabilize myself. The rail was two stories up. I never in-
         tended to jump over the railing because I would have been killed. I am not suicidal.
23       I have no mental health issues. My son was in the apartment, I had been helping
         him with his homework, there is no reason I would want to kill myself. I reached
24       for the nearby railing after Dutra grabbed me and began hurting me.

(ECF No. 58 Ex. 8 ¶ 2.)

On September 22, 2020, Defendants produced audio files containing an interview conducted by Lt. Greta Woyciehowsky pertaining to a previous complaint that Plaintiff filed with the Sparks Police Department. (ECF No. 44 Exs. 6–8.) In these files, they discussed cases where Plaintiff was previously arrested but the charges were dismissed. (ECF No. 44 Ex. 8 at 9:10–11:03.) Lt. Woyciehowsky explained what it meant to be arrested. (*Id.*) Plaintiff stated that she would say "yes" if she was ever asked if she had been previously arrested. (*Id.*) Even though Plaintiff made this claim in the interview, in response to Defendants' discovery request, she stated, on December 11, 2020, "Plaintiff is unaware of any prior arrests and has no record of conviction in any jurisdiction." (ECF No. 44 Ex. 13 at 3.) This required Defendants to search public records to find that Reno Police Department arrested Plaintiff in 2014. (ECF No. 44 Ex. 21.) Here too, Plaintiff contended that Reno Police Department used excessive force. (ECF No. 44 Ex. 20.)

In addition to the arrest by the Reno Police Department, there was an incident between Plaintiff and the Oakland Police Department in Oakland, California in 2002. She was detained for being in a stolen vehicle and placed in handcuffs. (ECF No. 44 Ex. 13.) Plaintiff claims that this did not result in an arrest. (*Id.*) Plaintiff filed a complaint with the City of Oakland contending that the police used excessive force against her. (*Id.*)

On March 25, 2021, CPS provided Defendants 119 pages related to Plaintiff's application for custody of A.M. These contained a document titled "Home Study Report." (ECF No. 44 Ex. 26.) This report contains six arrests that were returned through an FBI check of Plaintiff from 1997 to 2007. Plaintiff largely denies these arrests occurred, claiming they showed up on her background check only as a result of a stolen identity. But Plaintiff is noted as admitting that she was arrested for driving with a suspended license three times. (*Id.* at 9.)

///

On January 8, 2021, Defendants requested that Plaintiff "[p]rovide any and all medical records or documents related to any contact with medical professionals from January 1, 2015 to present." (ECF No. 44 Ex. 16.) Plaintiff had previously provided a disclosure that Dr. Sheri Barainca and Maricel Brady were medical professionals with knowledge of Plaintiff's injury purportedly stemming from the November 1, 2018 incident. (ECF No. 44 Ex. 12.) She had also previously provided nine pages of medical records from Reno Family Chiropractic and a page of narrative that seems to be unrelated to this case. (ECF No. 44 Exs. 10, 11.) Plaintiff described these records as complete and declined to provide further records to Defendants' request; she stated, on February 8, 2021, "Plaintiff has already provided all documents relating to medical records." However, the nine pages provided by Plaintiff indicate that a page is missing as one of the documents is missing "Page 1 of 3" and only contains "Page 2 of 3" and "Page 3 of 3." (ECF No. 44 Ex. 11.)

On March 12, 2021, Defendants obtained the entire and most current medical records for Plaintiff's treatment at Reno Family Chiropractic directly from Reno Family Chiropractic, which included treatment dates from December 11, 2017 through March 3, 2021. (ECF No. 44 Ex. 23.) These records show that Plaintiff had received more treatment than she had indicated in her "complete" medical records, including the following: She had received treatment December 18, 2017 through December 28, 2017. She received treatment from North Hill Chiropractic from November 18, 2016 to July 24, 2017. (ECF No. 44 Ex. 24.) She received treatment from North Hills Chiropractic for her neck pain, upper back pain, lower back pain, shoulder pain, and hip pain related to a large picture falling on her right shoulder and head area while at Subway. (*Id.*)[5]

///

---

[5] This evidence is further concerning because in another response to a request for admission Plaintiff claimed to have only suffered a lower back injury from the "SUBWAY INCIDENT." (ECF No. 44 Ex. 19 at 5.) As such, Plaintiff was apparently attempting to minimize prior injuries to overstate the alleged injuries sustained in the November 1, 2018 incident.

In an expert report from Maria Cecilia Brady, Ms. Brady contradicts another discovery response from Plaintiff. Plaintiff simply stated, "Deny," to a request to admit that she suffered injuries to her neck, arms, and back in a car accident. (ECF No. 19 at 4–5.) Ms. Brady stated that Plaintiff "continued treatment at Reno Family Chiropractic until 8-28-18. She had a total of 11 visits during this time which I would attribute to the MVA [motor vehicle accident]. She reports neck pain, right shoulder soreness and clicking and popping and low back pain." (ECF No. 44 Ex. 25 at 1.)

On February 26, 2021, Plaintiff refused to "[a]dmit that on the night of the SUBJECT IN-CIDENT you told Sgt. Edmonson that 'Your hand is right here, you can grab her.'" Plaintiff can clearly be heard making this statement in the BWC footage. (*See, e.g.*, ECF No. 44 Ex. 2 at 03:43:07–03:43:12.) Plaintiff further swore in an affidavit that she "listened to all of the body camera audios." (ECF No. 13 Ex. 12 ¶ 47.)

Before filing this motion, Defendants sent Ms. Keyser-Cooper an email stating their inten-tion of filing it. (ECF No. 50 Ex. 8.) In response, she contended, "Your attitude towards Ms. Jack-son has been so severe and wrongheaded I cannot but think there is inherent racism in your defense of this case." (*Id.*)

Lastly, while not a part of Defendant's original motion, they pointed to this fact in their reply in support of this motion for summary judgment. (ECF No. 58.) Ms. Keyser-Cooper misrep-resented a case precedent to bolster her legal position, claiming:

> This hybrid "free-to-leave/not free to leave standard [sic] was recently denounced in *U.S. v. Knights,* 989 F.3d 1281, 1290 (11th Cir. 2021) as "foisting on the citizen the complete responsibility for ascertaining whether the officer is detaining him." The *Knights'* case held that a citizen should not have to bet his well-being by guess-ing whether he is free to leave or not. "An officer's straightforward announcement of the Citizen's Fourth Amendment status prevents dangerous misreads, helping to protect both officers and citizens." *Id.*

///

(ECF No. 58 at 26–27.) She posited these contentions to rebut Defendants' correct statement of the law regarding detention being the standard recited by this Court in its analysis of summary judgment. Plaintiff neglected to inform this Court that this quote comes from the concurrence of the opinion. *Knights*, 989 F.3d at 1290. Further, the concurring judge was merely remarking he wishes the law was this rule but specifically noted that the Supreme Court considered this proposed rule and rejected it. In fact, the *Knights* court is in accord with the law of the Ninth Circuit and the Supreme Court. 989 F.3d 1281 at 1286 ("The test for whether the officer restrained a citizen's liberty is whether a reasonable person would feel free to terminate the encounter. We must imagine how an objective, reasonable, and innocent person would feel, not how the particular suspect felt." (internal citations and quotation marks omitted)).

## B.    There was no prejudice for the failure to preserve the text messages.

The Court has previously stated the standard under Fed. R. Civ. P. 37(e), which governs spoliation of ESI. The Court finds that Defendants have not shown all of the necessary elements for sanctions under Rule 37(e). Specifically, the Court finds that the text messages are not relevant to the case, and therefore there is no prejudice.

While Plaintiff has previously relied upon the text messages in her motion for summary judgment and she did try to show the messages to Defendants on the night of the incident, they do not have any bearing on this case. Defendants point to them as potentially forming evidence of the charge of kidnapping. They argue if Plaintiff had refused to attend meetings with CPS and to turn A.M. over to CPS, this would make the kidnapping charge more likely. It is true that this could potentially affect the charge, but it is not disputed that Defendants did not look at these messages. As such, the contents of these messages do not inform the propriety of the arrest because the test for probable cause is based off of the information known to the officers at the time of arrest. *O'Doan*, 991 F.3d at 1039.

The Court nonetheless notes that it is concerning that Plaintiff appeared to have lost this easily preservable information and that she repeatedly changed her story regarding when and how the messages were lost. Plaintiff initiated this case in May 2020. (ECF No. 1.) Defendants requested the production of the text messages on November 16, 2020. (ECF No. 44 Ex. 9.) Within the next few months, she refused to give Defendants these text messages claiming she lost the phone when she upgraded phones ten days later on November 26, 2020. (ECF No. 44 Exs. 13, 18.) Only after Defendants filed the motion for spoliation, her story changed to claim she got a phone a year prior to give her a defense to this motion. Nonetheless, sanctions are not proper on this issue as there was no prejudice.

### C.    Accusations of Bad Faith

In their motion, Defendants also seek to obtain attorney fees against Ms. Keyser-Cooper for bad faith under the Court's local rules and inherent authority. They claim that her actions minimally demonstrate a repeated lack of due diligence and at worst show she knowingly presented falsehoods to the Court.

The Court's Local Rules provide: "The court may, after notice and an opportunity to be heard, impose any and all appropriate sanctions on an attorney or party who: . . . (d) Fails to comply with the Nevada Rules of Professional Conduct . . . ." Rule 3.3(a) of the Nevada Rules of Professional Conduct states in relevant part, "A lawyer shall not knowingly: (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Rule 3.4 of the Nevada Rules of Professional Conduct states "A lawyer shall not: . . . (d) In pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party . . . ." Rule 8.4 of the Nevada Rules of Professional Conduct states "It is professional misconduct for a lawyer to: (a) Violate or attempt to violate the Rules of Professional Conduct,

knowingly assist or induce another to do so, or do so through the acts of another; . . . (c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) Engage in conduct that is prejudicial to the administration of justice . . . ."

District courts have inherent power to impose sanctions upon parties and their counsels. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006). For such sanctions to be proper, the court needs to find the party or counsel acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997) (discussing a sanction against an attorney). Such sanctions may take the form of attorney fees awarded to the opposing party. *Id.* Before imposing sanctions against opposing counsel under its inherent authority, "the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith." *Id.* (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).

The Court agrees with Defendants that the actions Ms. Keyser-Cooper are concerning. On a number of occasions, Ms. Keyser-Cooper assisted Plaintiff in making assertions to this Court that were clearly contradicted by the evidence available to them, Ms. Keyser-Cooper failed to reasonably comply with the discovery process, and Ms. Keyser-Cooper, herself, made at least two assertions to this Court that were untruthful:

- Ms. Keyser-Cooper presented testimony from Plaintiff on multiple occasions, wherein she swears, under oath, that she neither attempted to pass A.M. over the railing nor jump over the railing. This is in spite of the BWC footage which shows Plaintiff walking towards the railing with A.M. in her outstretched arms insisting that Defendants take A.M.; in spite of the footage showing Plaintiff on top of the railing when she was grabbed stating she was going to go back to her apartment; in spite of the footage showing that Plaintiff admitted her intentions of passing A.M. over the rail and jumping over the railing.
- Ms. Keyser-Cooper assisted Plaintiff to claim that she was "unaware of any prior arrests" in discovery, while evidence previously presented to Plaintiff from Defendants in discovery showed Plaintiff talking with Lt. Woyciehowsky and admitting to being previously arrested.
- Ms. Keyser-Cooper assisted Plaintiff in refusing to "[a]dmit that on the night of the SUBJECT INCIDENT you told Sgt. Edmonson that 'Your hand is right here, you can

grab her.'" Plaintiff can be clearly heard making this statement to Defendant Edmonson in the BWC footage.

- With Ms. Keyser-Cooper's help, Plaintiff claimed that she gave the complete medical records from Reno Family Chiropractic, which amounted to nine pages. When Defendants got the records from Reno Family Chiropractic, they showed additional documents evincing previous treatments.
- Further, in discovery, Ms. Keyser-Cooper facilitated Plaintiff in denying that she had any other electronic messages discussing the case, specifically mentioning Facebook. However, in Defendants' review of Plaintiff's public Facebook profile, they were able to find numerous discussions of the case by Plaintiff.
- In regard to the text messages, Ms. Keyser-Cooper helped Plaintiff to change her story as to when she got the new cell phone losing the text messages with Ms. Clark from CPS. Ms. Keyser-Cooper further claimed she had personal knowledge that Plaintiff only had one text message preserved because it was a screenshot. Plaintiff's Facebook profile, however, had at least one additional screenshot, which included several more messages between her and Ms. Clark.
- In response to Defendants' summary judgment motion, Ms. Keyser-Cooper misrepresented the holding from a case to support her position.

These findings appear to show a repeated lack of candor to this Court, failures to make reasonable efforts to comply with reasonable discovery requests in violation of Nevada Rules of Professional Conduct, and demonstrate bad faith. Nonetheless, the Court again finds that Defendants were not prejudiced by these actions. Indeed, the Court agrees that they have successful motion for summary judgment. Further, the motion for summary judgment was based almost entirely upon evidence available to Defendants from the outset of the case—the body camera footage. The Court therefore declines to issue sanctions in this case.

In conclusion, the Court understands why Plaintiff initiated this case. She was scared and confused by the presence of officers at her home at night, which explains her obstructive conduct on the night of the incident. Nonetheless, the Court finds that Defendants clearly had probable cause for the arrest as explained above.

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiff's Motion for Sanctions (ECF No. 37) is DE-NIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (ECF No. 42) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Sanctions (ECF No. 44) is DE-NIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (ECF No. 52) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (ECF No. 54) is GRANTED.

IT IS FURTHER ORDERED that the clerk shall enter judgment accordingly and close the case.

IT IS SO ORDERED.

Dated March 29, 2022.

_____
ROBERT C. JONES
United States District Judge